(No. 4422—

WILLIAM WILLIAMS, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed May 13, 1952.*
*Petition of Claimant for lump sum settlement denied July 8, 1952.*

ROBERT J. SAUNDERS, Attorney for Claimant.

IVAN A. ELLIOTT, Attorney General; C. ARTHUR NEBEL, Assistant Attorney General, for Respondent.

DELANEY, J.

William Williams, claimant, filed his claim herein on April 11, 1951, wherein he alleges that on September 6, 1950 he was employed by the respondent at Grand Marais Park, St. Clair County, Illinois, as a watchman. On the above date, in the course of his employment and while inspecting garages, he slipped on a round piece of wood and fell. As a result of the fall, he fractured his left leg at the hip.

The record consists of the complaint, Departmental Report, transcript of evidence, claimant's X-Ray exhibits Nos. 1 and 2, reporter's bill, motion of claimant for an extension of time in which to file abstract of evidence, order of Chief Justice granting claimant an extension of time in which to file abstract of evidence,

abstract of evidence, motion of claimant for leave to reopen proofs for purpose of introducing additional testimony, order of Chief Justice granting claimant's motion for leave to reopen proofs for the purpose of introducing additional testimony, Supplemental Departmental Report, original transcript of additional testimony, containing claimant's exhibit No. 3, copy of transcript of additional testimony, and statement, brief and argument of claimant.

No jurisdictional question is raised. Respondent and claimant were operating under the Workmen's Compensation Act, and the accident in question arose out of and in the course of the employment. Respondent furnished complete surgical, medical and hospital treatment.

The question to be considered is the extent of permanent disability suffered by Mr. Williams.

Mr. Williams was a widower, and did not have any children dependent upon him for support. He was first employed by respondent on December 31, 1949, and received a salary of $8.00 per day, well in excess of $1,560.00 per year. His compensation rate would, therefore, be the maximum of $15.00; since the injury occurred subsequent to July 1, 1949, this must be increased 50%, making a compensation rate of $22.50 per week.

Claimant returned to work on February 15, 1951, and answered telephones to relieve another employee, who was going on vacation. Claimant was brought to and from work. On November 7, 1951, Mr. Ray Hubbs, Park Superintendent, wrote Mr. Williams as follows:

"You can understand, I am sure, that in a park as large as Grand Marais, it is necessary to have men who are strong and physically active. As a result of your broken hip, it was, of course, not possible for us to use you in your capacity as night watchman, or in any other active employment. For these reasons, when the season slackened, we felt it advisable to discontinue your employment."

The final date of claimant's employment was September 15, 1951.

Dr. Robert E. Shea testified at the hearing of this cause as follows:

"The physical examination revealed a well developed, well nourished, elderly white male, who walked with a decided limp in his left leg, and complained particularly of pain after climbing the flight of stairs to my office. The physical examination was essentially negative except for the lower back and left leg. The lower back showed a moderate degree of muscle spasm in the lumbar-sacro region involving the post vertebral erector muscle. This seemed to be compensatory in nature and due to the fact that Mr. Williams is required to bear most of his weight on the right leg in order to prevent pain from developing in the left hip because of weight bearing on that limb. Upon measuring the length of the legs, it was found that there is approximately two and a half centimeters, or one inch, foreshortening of the left leg, and a compensatory pelvic tilt making up somewhat for the shortening of the left leg. He was wearing a shoe at the time that was built up approximately two centimeters to aid the compensation of the foreshortening. The hip joint itself was limited in all directions, probably by virtue of an arthritic condition resulting from the fracture within the joint itself. All functions of the trunk and hip joint are limited more than fifty percent, probably due to the arthritic condition of the healing process along with the spastic state of the muscles and ligaments about the joint and the effect of the foreshortening of the leg in the healing process. There was approximately sixty percent disuse atrophy of the quadratus femoris muscle groups of the left leg resulting from the long application of traction and disuse. Any function, such as bending, stooping, sitting, or rising from a sitting position, bending the trunk laterally from one side to the other, are markedly decreased in function because of the result of the healing process of the fractured site. Reflexes in the left leg decidedly depressed and patient is melancholy in attitude.

I thought the man was permanently and totally incapacitated insofar as gainful employment is concerned for the future where any industry or corporation is involved, although he is able to get about in a rather clumsy fashion with the aid of a cane. I do not believe he will ever reach a state where he may be able to hold a job to allow him to maintain himself at the present cost of living. I doubt seriously if there will be any improvement in the condition of this patient, and, if anything, I believe there will be greater foreshortening of the leg because of the healing process, and another build up of his shoe will be required to make up for the foreshortening. If this is not done, a curvature of the back with a rotary displacement of the vertebral column in the region of the lower extremities will develop and the patient will have a permanent sclerosis—curvature of the back.

If this callous increases in size continuously, the man is going to have shortening and loss of any function of the hip joint. He is going to develop a painful joint which may require further surgery. The pelvic tilt will become more aggravated due to weight bearing. The lower back is going to develop curvature or sclerosis, and the man is going to be an invalid. If, after a period of a year, this process is continuous, be must be declared totally and permanently disabled.

He will have no use of that limb at all, and pain of the joint itself will make him an invalid. He is not far from that right now."

## Dr. Frank Bihss testified as followed:

"The exhibit 1 reveals an oblique projection of the hip. The oblique projection in this means the patient is turned at approximately a forty-five degree angle and having his right hip overlying the left in order that you can visualize the back portion of the left hip in this particular case. This reveals a healed intertrochanteric fracture. That is part of the femur, which is between the base of the neck and the shaft, and the trochanteric are the greater and lesser. The greater trochanteric is pronounced on the outer portion of the shaft where the muscles insert, and the lesser trochanteric is the smaller boney protuberance present on the inner portion of the shaft, and the fracture right at that junction therefore is described as an intertrochanteric fracture. It is healed with a coxa vara deformity. The normal angle has been somewhat impaired and giving an adduction type of deformity. We call that a coxa vara deformity. In other words, here, with some impaction. The lesser trochanteric is displaced immediately upward and you can see a large amount of callous in the lesser trochanteric. That is the oblique projection."

From the undisputed medical testimony, and other evidence in the record, it is shown that the claimant is permanently disabled, and is not able to do work of any kind, and that his physical condition will become progressively 'worse. We feel his unsuccessful attempt at returning to work to answer telephones shows his inability to gain employment.

Claimant purchased a pair of built-up shoes for the sum of $25.00, and he should be reimbursed for this amount.

We conclude, therefore, that the claimant is entitled to an award for permanent total disability.

The claimant is, therefore, entitled to an award of $6,000.00, plus reimbursement of $25.00 for built-up shoes, making a total of $6,025.00, less the sum of $1,072.00, which was paid for non-productive time, or a total award of $4,953.00, payable as follows:

$1,998.57, which has accrued from September 7, 1950 to May 13, 1952 from which must be deducted the sum of $1,072.00, making a sum of $926.57, which is payable forthwith; $4,026.43 to be paid in weekly installments of $22.50 beginning May 20, 1952 for a period of 178 weeks with a final payment of $21.43; thereafter

a pension for life in the sum of $480.00 annually, payable in monthly installments of $40.00.

An award is also made to Henry P. Keefe for stenographic services in the amount of $67.60, which is payable forthwith. The Court finds that this is a fair, reasonable and customary charge.

This award is subject to the approval of the Governor, as provided in Section 3 of "An Act concerning the payment of compensation awards to State employees".